IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs July 25, 2012

## STATE OF TENNESSEE v. JAMES L. DOWELL, III

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2010-B-1177     Cheryl Blackburn, Judge**

_____

**No. M2011-02096-CCA-R3-CD -Filed September 11, 2012**

_____

A Davidson County jury convicted the Defendant, James L. Dowell, III, of first degree felony murder, and the trial court sentenced him to a life sentence in the Tennessee Department of Correction. On appeal, the Defendant contends that: (1) the trial court erred when it ruled that if the Defendant presented the testimony of his accomplice the State could cross-examine the accomplice about past criminal activities in which both the Defendant and the accomplice willingly participated; and (2) the evidence is insufficient to sustain his conviction. After a thorough review of the record and relevant authorities, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR. and ROGER A. PAGE, JJ., joined.

Charles Walker, Nashville, Tennessee, for the appellant, James L. Dowell, III.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Victor S. Johnson, III, District Attorney General, and Bret Gunn, Assistant District Attorney General for the appellee, State of Tennessee.

**OPINION**
**I. Facts**

This case arises from a robbery at Ace Market in Davidson County, Tennessee, during which one of the employees was shot and killed. For his participation in the robbery, the Defendant was indicted on charges of first degree felony murder, attempted second degree murder, and employing a firearm during a dangerous felony. The State dismissed the attempted second degree murder and firearm charges, and a trial was held on the charge of

first degree felony murder. The parties presented the following evidence at trial: Gift Bondwe testified that, at the time of this robbery, he was employed at the Ace Market, which was a grocery store that also sold beer and T-shirts. He recalled that, on December 10, 2008, he was working as a cashier at the market and that Lindbergh Thompson was working also, stocking the coolers, cleaning up, and taking out the trash. Bondwe testified that Thompson was killed while taking out the trash.

Bondwe described the events leading up to the shooting, saying that Bondwe was at the cash register organizing the money received from sales that evening. Thompson went to take the trash to the dumpster, and Bondwe heard a "boom boom." Bondwe said he immediately thought that it was the dumpster lid and wondered why Thompson was playing with the dumpster lid. Bondwe stated that, at that moment, nothing indicated that a robbery was going to occur. Bondwe recalled that a customer who had previously left the market came running back into the market, saying "[T]hese people are crazy . . . they're shooting outside." Bondwe said he walked to one of the store coolers while calling 911 to report the shooting.

Bondwe testified that, from his position in the store cooler, and while on the phone with 911, he could see through the glass door of the cooler. He saw a man who owned the establishment next door come into the store. The man asked if anyone was inside and said that someone outside had been shot. Bondwe said that, at this point, he knew it was safe to go outside, so he exited the store. Upon walking outside the store, he saw Thompson lying on the ground near the side of the store. He described Thompson as "in bad shape," and he recalled telling Thompson that he was going to get help. Thompson shook his head and then did not move again.

Bondwe said that, when police arrived, he recounted the events for them, including that a customer had returned to the store after hearing the gunfire outside. When he returned to the inside of the store, he saw the customer, Antionette Bell, crawling from a second cooler in the store away from a pool of blood. At that point, he realized that she had also been shot.

Bondwe testified that the store had some video surveillance of the shooting and that he gave the video footage to police officers. The video of the shooting was then played for the jury. The video showed the Defendant entering the store. Bondwe recalled that, when the Defendant entered the store, he spoke to Bondwe, saying, "[W]hat's up, Chicken George," which was a statement both men recognized as a greeting. The Defendant, who was on the phone, walked to the back and asked Bondwe several times the price on different items, which Bondwe found unusual. Thompson opened the door "a little bit," and, in doing so, Thompson was ensuring that everyone was out of the store before Thompson took the

-2-

trash to the dumpster. Bondwe said that Thompson was "very cautious" about security. The video depicted the Defendant leaving the store and Thompson leaving to take out the trash. The footage showed Bell coming into the store, showed her leaving, and briefly showed the shooter.

During cross-examination, Bondwe testified that the Defendant called him "Chicken George" because Bondwe used to cook "good chicken." Bondwe testified that he was alone in the store after Thompson left to take the trash to the dumpster and that the Defendant exited the store.

Antionette Bell testified that she was shot in her left arm on December 10, 2008, while she was at Ace Market. She described the events leading up to the shooting, saying that she walked from her home to the market, where she often shopped, to purchase beer and cigarettes. Before entering the store, she noticed a gray or silver car and saw two men, one of whom was the Defendant, getting out of the car. Bell asked the Defendant if he "had a light." The Defendant said, "[N]o, baby girl, I ain't got no light." He then felt in his pockets and said, "[Y]eah, I do got a light," and he lit her cigarette. The Defendant, as seen on the video footage, entered the store. Bell said she stood at the front corner of the building when the Defendant exited the store and Thompson came outside with the trash. Bell said she did not interact with the Defendant at this time, and she stayed in front of the market smoking her cigarette.

Bell testified that she then heard a voice say, "[G]o get the money out of the register," to Thompson, and she heard Thompson respond to the speaker to "go get the money" themselves. After that, Bell heard a "couple" of shots, and she ran inside the store and hid inside one of the store coolers. She said that, at some point, she felt a burn. She opened a beer and began to drink it and then lost consciousness. When she regained consciousness, she began to crawl out of the cooler.

During cross-examination, Bell testified that she could not identify the shooter. She agreed that she had been drinking that evening but denied that she was intoxicated. She said that she had smoked marijuana earlier that day but denied using crack cocaine that day. Bell said she saw Brian Moreland at the market the evening of the shooting and that he gave her a dollar. Bell admitted that she had previously been convicted of two counts of attempted second degree murder.

Lieutenant Matt Pylkas, with the Metropolitan Nashville Police Department, testified that, when he received the call about this shooting, he traveled a few miles north of the market and then back to the market, hoping to find a suspicious vehicle or person of interest fleeing the market. He said that when he arrived at the 1000 block of Edgehill, he noted a

vehicle that fit the description of the vehicle involved in this shooting, a silver Chevy Impala with a spoiler on the rear, some damage to one of the quarter panels, and a temporary tag. The lieutenant said he approached the unoccupied vehicle. He noted that it was a cold and rainy December night, and he noted that there was heat emanating from the engine. Lieutenant Pylkas looked inside the vehicle, and he saw what appeared to be black stocking caps. The lieutenant remained at that location until he was relieved by other officers.

Officer George Bouton, with the Metropolitan Nashville Police Department, testified that his responsibilities included processing crime scenes. On December 10, 2008, Officer Bouton responded to a shooting call at Ace Market and said both victims had already been transported when he arrived. The officer identified, and the court admitted, his diagram of the crime scene. On the diagram, he identified the location of spent shell casings and a projectile. These items were given to the Tennessee Bureau of Investigation ("TBI") for testing.

Jerome Oseibonsu testified that he owned Kobby's Auto Sales in Nashville. In 2009, police contacted him about a car that he had sold to a man named Rivera Peoples. He said the bill of sale showed that he sold the car, a 2000 gray Chevrolet Impala, on November 24, 2008. Peoples provided Oseibonsu several references in the event that Peoples defaulted on the loan. The first reference was Peoples's brother, Antonio Harris. The other references were Brian Moreland, the Defendant, and Shameka Harris.

Lynette Mace, a civilian with the Metropolitan Nashville Police Department, testified that she processed the Chevy Impala involved in this case. She took photographs of the car, swabbed it for DNA, gathered fingerprints, and collected evidence for DNA testing. Mace recalled that there were a "number" of items in the car that she gathered, including: a cigarette butt, a hairbrush, a key, some black gloves, some shoes, multiple black bandanas, one white bandana, two black toboggan hats, a red umbrella, and a T-shirt. Mace said she looked in the glove compartment and found paperwork for the sale of the car, a driver's license, a lottery ticket, a wallet, and a stack of CDs. The name listed on the driver's license and on the auto sale contract was Rivera Letroy Peoples. Another officer, Officer Thomas Simpkins, processed the CDs for fingerprints. He obtained latent prints on seven of the CDs.

Belinda Shea, a civilian latent fingerprint examiner with the Metropolitan Nashville Police Department, testified that she was able to match four of the latent fingerprints given to him by Mace. He matched the fingerprints to the known prints of Rivera Peoples and the Defendant. The Defendant's prints were found on a dryer sheet box located inside the car. On the CDs processed by Officer Simpkins, Shea found the fingerprints of Rivera Peoples and Brian Moreland.

Thomas Deering, M.D., testified that he was the medical examiner who performed the autopsy on Thompson's body. Deering said Thompson died from injuries resulting from multiple gunshot wounds, after having been shot three times. The doctor described the entrance and exit wounds and the damage caused by the path of the bullets for these three separate wounds. The doctor said he was able to recover one of the bullets, which he saved and turned over to police for further testing.

Detective Jill Weaver, with the Metropolitan Nashville Police Department, testified that she was assigned to investigate Thompson's homicide. She said she arrived at the scene of the shooting at 10:44 p.m. and that, shortly after arriving, she obtained the store security video. Detective Weaver created some still photographs from the video, which she showed to the jury. One of the pictures showed a man shooting into the Ace Market building. The detective testified that the documents located in the glove compartment of the gray Chevy Impala showed that the car had been purchased sixteen days before the shooting. The names of four men, and a phone number for each respective man, were listed on the sales contract. The Defendant's name was one of the names listed on the contract. Detective Weaver testified that she took shell casings and a projectile she found at the scene of the shooting to the TBI for analysis.

During cross-examination, Detective Weaver testified that she interviewed Bell, who told her that the shooter wore a yellow racing jacket. During redirect examination, the detective said that Bell was in the hospital at the time of their interview and that she was being treated for injuries that were "serious in nature." She was under heavy medications at the time of their interview.

Several TBI agents testified about the testing performed on the evidence submitted by police involved in investigating this case. Agent Alex Brodhad testified that the bullet recovered from Thompson's body and all of the cartridge cases recovered from the crime scene were fired by the same nine-millimeter gun. Agent James Russell Davis, II, testified that he tested items found in Peoples's car for gunshot residue. Agent Davis found gunshot residue on four gloves from the car. Agent Michael Turbeville testified that he tested items submitted by police for the presence of DNA. The Defendant was consistent as a contributor of DNA on several items found in Peoples's car, including: two pairs of gloves and a toboggan hat. The agent confirmed the presence of the Defendant's DNA on two bandanas and a cigarette butt.

Moreland testified that, on December 10, 2008, he was involved in attempting to rob the Ace Market with Peoples, Harris, and the Defendant. He said that Harris and Peoples were brothers and that the Defendant was dating their sister. Moreland said he also dated one of Harris's and Peoples's sisters. Also, Peoples was the father of the Defendant's sister's

children. Moreland testified that, on the night of the attempted robbery, Peoples was driving an Impala that he had recently purchased. A few hours before going to the market, the men began discussing how they needed money. Moreland said all of the men participated in this discussion, and they settled on robbing the Ace Market. Moreland said the plan for the robbery was that the Defendant would enter the store and see who was present. Then, Moreland and Harris would enter the market with their faces covered with bandanas and rob the clerk.

Moreland said that, when they arrived at the market, they sat in the car for a period of time discussing the robbery plan. The Defendant then got out of the car and went into the market to see who was there. While the Defendant was in the store, Peoples moved his car to another location, an alley beside the store. The Defendant was on the phone with Peoples while the Defendant was inside the store. Moreland said Peoples said that they were good to start the robbery, so Moreland and Harris began putting on their bandanas to start the robbery. Moreland recalled that, as the Defendant exited the store, another man came out also, carrying a trash bag and walked toward the dumpster. Harris, who had his bandana on, "hopped" out of the car and shot the man. Harris then ran to the front of the store and shot in the store, and then he came back around the car and shot the man carrying the trash bag again. Harris then got inside the car. The four men left the market and went to Harris's house.

Moreland testified that the Defendant did not say anything when he returned to the car from the market. He said that there was no communication between the Defendant and Harris before Harris got out of the car and shot the man taking trash to the dumpster.

During cross-examination, Moreland testified that he used his own free will when he participated in this robbery. Moreland said he did not go into the store to rob it because Harris jumped out of the car and shot the man. He conceded that he did not hear what the Defendant said to Peoples during their phone conversation. He denied that he shot anyone and denied that he had said that "some lady grabbed something out of [his] hand and that's why [he] shot her." He also denied saying that "the old man got in the crossfire and [he] didn't mean to kill him." Moreland agreed that he denied his involvement in this crime when he was first questioned by police. Moreland agreed that he had previously been convicted of criminal impersonation.

Based upon this evidence, the jury convicted the Defendant of first degree felony murder, and the trial court sentenced him to a life sentence in the Tennessee Department of Correction.

## II. Analysis

On appeal, the Defendant contends that: (1) the trial court erred when it ruled that if the Defendant presented the testimony of his accomplice then the State could cross-examine the accomplice about past criminal activities in which both the Defendant and the accomplice willingly participated; and (2) the evidence is insufficient to sustain his conviction.

### A. Antonio Harris

At trial, the Defendant sought to offer the testimony of Antonio Harris, one of the men involved in the robbery. The Defendant posited that Harris would testify that the Defendant said he did not want to participate in the robbery before Harris shot and killed Thompson. The State told the trial court that, if Harris so testified, the State wanted to cross-examine Harris about robberies that Harris and the Defendant both admitted they committed together. The trial court held a jury-out hearing to determine to what extent Harris would be subject to cross-examination by the State.

During the jury-out hearing, Antonio Harris testified that the Defendant had no involvement in this shooting. Harris took responsibility for the shooting and said that he had pled guilty to charges stemming from it. Harris explained that he asked the Defendant to be a lookout during the robbery. Harris said that, "once [the Defendant] did that[,]" the Defendant "changed his mind about the acts." Harris said that Harris "jumped out of the car" continued doing "what [he] intended to do from the beginning." Harris said the Defendant had no other involvement in this crime.

During the jury-out cross-examination, Harris testified that he and the Defendant were together for a couple of hours before the shooting. He said that the two men met up with a third man, Harris's brother Peoples, and then, shortly before the murder, they met up with a fourth man, Moreland. Harris said he proposed that the four men rob the market, and, initially, the Defendant and Peoples refused. Harris recalled that Moreland was intoxicated and "out of it mentally," so he did not respond. Harris said that he had a gun in his hand at the time and that he threatened the Defendant and "intimidat[ed]" him so that the Defendant would assist in the robbery. Harris testified that the Defendant only went into the market because of Harris's threats against him. He similarly testified that the only reason Peoples participated was because of his threats. He said both men knew that he would hurt them if they did not participate in the robbery.

Harris conceded that, a few weeks before the Ace Market shooting, he, the Defendant, Moreland, and Peoples invaded a family home in the Green Hills area of Nashville. The men covered their faces with bandanas, and Harris brandished a weapon. The men forced the

-7-

people in the house, at gunpoint, to get into a car and drive to two automatic teller machines ("ATMs"). The men used the people's personal identification numbers to withdraw money from their accounts. Harris said that he had forced the Defendant to participate in those kidnappings and robberies as well. Harris testified that, after this robbery, the Defendant continued to associate with Harris because the Defendant had no choice and because the Defendant was afraid of Harris. Harris said "I had more pull on the street than you can imagine."

Harris conceded that he and the Defendant were members of an organization known as "Growth and Development." He further conceded that other people called the organization "Gangster Disciples." Harris testified that the colors often associated with his organization were blue, grey, and black. Harris agreed that the bandanas found in the car were colors associated with his organization. Harris acknowledged that he had "tear drop tattoos," and he explained that the tattoos meant that he had "lost a couple of [his] friends." Harris agreed that the tattoos could also mean that he had killed a "couple of people."

Harris testified that the Defendant was dating one of Harris's sisters. He said he and his sister both lived in the Edgehill area but that they lived separately.

Harris testified that the bandanas were in the car before he decided to commit the robbery. He explained that his "dress code" required that he wear a bandana if he entered a club or similar establishment. When he decided to commit the robbery, he pulled into the market and told the Defendant to go inside the store and see how many people were there. Harris said he got out of the car before the Defendant returned to the car. Harris said that, as he approached the store, he saw Thompson taking out the trash. Harris recalled that, when he returned to the car after shooting Thompson, the Defendant was in the car, and the four men left immediately after the shooting.

The State questioned Harris about when, during the robbery, the Defendant allegedly told Harris that the Defendant no longer wanted to participate in the robbery, given Harris's testimony that the Defendant did not return to the car until after Harris had left the car to shoot Thompson. Harris said the Defendant told him this when Harris "was in the car." Harris then said the Defendant got back to the car before Harris exited the car and shot Thompson. He clarified that it was at this point that the Defendant said he did not want to participate in the robbery.

During the jury-out redirect examination, Harris testified that he got out of the car twice on the evening of the shooting. He said he was in the alley both times and that the Defendant said he no longer wanted to participate in the robbery before Harris got out of the car the second time.

Defense counsel told the trial court that the defense wanted to introduce Harris's testimony to show that the Defendant no longer wanted to participate in the robbery. The State countered that Harris's testimony would allow questioning about Harris and the Defendant's participation in previous robberies together. The trial court ruled that if Harris testified that the Defendant expressed his desire to no longer participate in the robbery then the State could ask Harris questions to determine whether Harris was being truthful in this testimony. Those questions, the trial court stated, included questions about their relationship and their previous joint criminal ventures. Ultimately, the Defendant chose not to call Harris to testify based on the trial court's ruling.

On appeal the Defendant contends that the trial court erred when it ruled this was an admissible line of questioning by the State. The Defendant contends that the evidence the State sought to elicit from Harris was hearsay and did not fall within one of the hearsay exceptions. He further contends that the trial court's error violated his constitutional rights, shifting the burden to the State to prove the error was harmless. The State counters that the trial court did not abuse its discretion when it determined that the State could question Harris about his past involvement in criminal activity with the Defendant.

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). As a general rule, hearsay is not admissible at trial except as provided by the rules or otherwise by law. Tenn. R. Evid. 802. Tennessee Rules of Evidence 803 and 804 provide exceptions to the general rule of inadmissibility of hearsay. Because "[n]o factual issue attends" the trial court's determination whether a statement is hearsay, "it necessarily is a question of law." *State v. Gilley*, 297 S.W.3d 739, 760 (Tenn. Crim. App. 2008). Although the application of the various exception to the hearsay rule "may initially depend upon factual determinations" to which a reviewing court must defer, the trial court "has no discretion to exclude hearsay exception evidence that is otherwise admissible under the rules of evidence." *Id.* at 760-61. Thus, the appropriate standard of review to be applied to the trial court's decision admitting or excluding hearsay evidence is de novo.

In this case, the trial court determined that Harris's testimony that the Defendant stated to Harris that the Defendant no longer wanted to participate in the robbery was a hearsay statement. This statement was offered to prove the truth of the matter asserted. *See* Tenn. R. Evid 801(c). Further, the statement was not a party-opponent admission because it was not offered against the Defendant and was not a statement made by or adopted by the Defendant or agent of the Defendant. Tenn. R. Evid. 803 (1.2) (stating that a statement is not hearsay if offered against a party that is (A) the party's own statement in either an individual or a representative capacity . . . .). The trial court ruled that this hearsay statement was admissible pursuant to Tennessee Rule of Evidence 803(3), which defines the "state of

mind" hearsay exception as "[a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will." Notably, "only the declarant's conduct, not some third party's conduct, is provable by this hearsay exception." *Id.*, *Advisory Comm'n Cmts.*; *see also State v. Hutchison*, 898 S.W.2d 161, 171 (Tenn. 1994).

The trial court ruled, however, that Harris's testimony was subject to being impeached during cross-examination about the Defendant's statement to Harris. The trial court cited Tennessee Rule of Evidence 806 in support of the State's ability to impeach Harris. Tennessee Rule of Evidence 806 provides:

> When a hearsay statement has been admitted in evidence, the credibility of the declarant may be attacked and, if attacked, may be supported by any evidence which would be admissible for those purposes if declarant had testified as a witness. Evidence of a statement or conduct by the declarant at any time, inconsistent with the declarant's hearsay statement, is not subject to any requirement that the declarant be afforded an opportunity to deny or explain.

Tenn. R. Evid. 806. As the Advisory Commission Comments to this rule note, "[t]his rule makes clear that hearsay declarants are subject to impeachment to the same extent as trial witnesses" are via Rule 613, but the hearsay declarant need not be given an opportunity to explain or deny the statement when impeached by a prior inconsistent statement. Tenn. R. Evid. 806, *Advisory Comm'n Comments*.

Pursuant to this rule, Harris's testimony about the Defendant's statement, who for Rule 806 purposes would be the "declarant," subjects the Defendant's credibility to attack by evidence that would be admissible if the Defendant had testified as a witness. Evidence of the Defendant's conduct "at any time" inconsistent with the Defendant's statement is not "subject to any requirement that he be afforded an opportunity to deny or explain." *See* Tenn. R. Evid. 806.

The question then becomes whether, had the Defendant testified, evidence of the armed robbery that he and Harris committed shortly before the Ace Market killing would have been admissible. To be admissible, evidence must satisfy the threshold determination of relevancy mandated by Rule 401 of the Tennessee Rules of Evidence. *See, e.g., Banks*, 564 S.W.2d at 949. Rule 401 defines "relevant evidence" as being "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid.

401. However, relevant "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ." Tenn. R. Evid. 403; *see also Banks*, 564 S.W.2d at 951.

The general rule is that evidence of a defendant's prior conduct is inadmissible, especially when previous crimes or acts are of the same character as the charged offense, because such evidence is irrelevant and "invites the finder of fact to infer guilt from propensity." *State v. Hallock*, 875 S.W.2d 285, 290 (Tenn. Crim. App. 1993). Tennessee Rule of Evidence 404(b) permits the admission of evidence of prior conduct if the evidence of other acts is relevant to a litigated issue such as establishing identity, motive, common scheme or plan, intent, or absence of mistake. Tenn. R. Evid. 404(b) and *Advisory Comm'n Cmts.*; *State v. McCary*, 119 S.W.3d 226, 243 (Tenn. Crim. App. 2003). The rule specifically provides, however, that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." Tenn. R. Evid. 404(b).

We conclude that the trial court did not err when it determined that Harris would be subject to cross-examination about whether he and the Defendant had recently pled guilty to committing an armed robbery together. Although this evidence meets the criteria of character evidence, the trial court correctly determined that the evidence is relevant to the litigated issue of the Defendant's motive and intent to participate in the armed robbery. The Defendant sought to introduce evidence that he told Harris he no longer wanted to participate in the robbery, and the fact that he and Harris had, shortly before this offense, committed a home invasion together wherein they robbed and kidnapped the home owners became relevant to show the Defendant's motive and intent. Having found that the trial court did not err, the Defendant is not entitled to relief on this issue.

**B. Sufficiency**

The Defendant next contends that the evidence is insufficient to sustain his conviction for first degree felony murder. He notes that the State's only witness to offer evidence that the killing took place during the robbery attempt was Antionette Bell, whom he impeached on three different occasions with her prior inconsistent statements. The State counters that the jury, by its verdict, resolved any conflict in Bell's testimony, rendering the Defendant's challenge to Bell's testimony without merit.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P.

13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). The jury decides the weight to be given to circumstantial evidence, and "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citations omitted). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of the witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *Liakas*, 286 S.W.2d at 859. "'A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State.'" *State v. Cabbage*, 571 S .W.2d 832, 835 (Tenn. 1978) (quoting *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973)). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *Goodwin*, 143 S .W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant

bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

In this case, the Defendant was convicted of first degree felony murder in the perpetration of a robbery, which requires proof beyond a reasonable doubt that a defendant killed the victim during the perpetration of or an attempt to perpetrate a robbery. *See* T.C.A. § 39-13-202(a)(2) (2010). The mental state required for the conviction is whether the Defendant possessed the intent to commit the underlying offense, which in this case was a robbery. Robbery is "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." T.C.A. §§ 39-13-202(a)(2), -202(b) (2010), and 39-13-401(a) (2010). Under a theory of criminal responsibility, "[p]resence and companionship with the perpetrator of a felony before and after the commission of the offense are circumstances from which one's participation in the crime may be inferred." *State v. Ball*, 973 S.W.2d 288, 293 (Tenn. Crim. App. 1998). No particular act need be shown, and the defendant need not have played a physical role in the crime in order to be held criminally responsible for the crime. *State v. Caldwell*, 80 S.W.3d 31, 38 (Tenn. Crim. App. 2002). Rather, to be held criminally responsible for the acts of another, the defendant need only "associate himself with the venture, act with knowledge that an offense is to be committed, and share in the criminal intent of the principal in the first degree." *State v. Maxey*, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994); *see also State v. Steven Nelorn Hampton, Jr.*, No. M2004-00704-CCA-R3-CD, 2005 WL 677279, at *5 (Tenn. Crim. App., at Nashville, Mar. 24, 2005) (finding sufficient evidence to convict the defendant of especially aggravated robbery under a criminal responsibility theory because he admitted that he shared in the proceeds of the robbery, was present at the scene of the crime, and was with his co-defendants both before and after the commission of the crime).

In the case under submission, the evidence viewed in the light most favorable to the State proved that the Defendant and three other men, Harris, Peoples, and Moreland, met and decided to commit a robbery. The plan to commit the robbery included that the Defendant enter the market, see who was present, and inform the others. Peoples was driving the car and Harris, who was armed with a gun, and Moreland were going to enter the store and commit the robbery. The Defendant entered the market, as seen on surveillance video, called Peoples, who told Moreland and Harris that they were okay to proceed with the robbery. Before Moreland could exit the car to enter the store, Harris exited the car and shot Thompson, an employee of the market. Harris also shot in the direction of the market, hitting Bell. The four men got back into the car and drove to Harris's house. This evidence is sufficient to support that the Defendant is criminally responsible for the attempted robbery that resulted in the killing, and, thereby, supports his conviction for first degree felony murder.

As to the Defendant's specific argument that Bell lacked credibility based upon his impeachment of her, this Court may not resolve questions of witness credibility on appeal. That function is solely within the province of the trier of fact. *Bland*, 958 S.W.2d at 659. The jury, by its verdict, accredited Bell's testimony to the extent her testimony was necessary to his conviction. We will not disturb the jury's findings. The Defendant is not entitled to relief on this issue.

### III. Conclusion

In accordance with the aforementioned reasoning and authorities, we conclude that the trial court did not commit any evidentiary errors in its rulings and that the evidence supports the Defendant's conviction. We, therefore, affirm the Defendant's conviction.

_____
ROBERT W. WEDEMEYER, JUDGE